Argued and submitted September 4, 1984, affirmed and remanded for trial
August 27, 1985

# STATE OF OREGON,
*Respondent on Review,*

*v.*

# KENNETH ALLEN MOYLE,
*Petitioner on Review.*

## (DA 240844-8208; CA A28286; SC S30468)

705 P2d 740

Lawrence Matasar, Portland, argued the cause and filed a memorandum of law for petitioner on review. With him on the memorandum was Hoffman, Matasar & Glaeser, Portland. On the petition for review were David L. Slader and Hoffman, Slader & Matasar. Marcia Levy, Metropolitan Public Defender, Portland, filed the brief and argued the cause in the Court of Appeals.

Robert W. Muir, Assistant Attorney General, Salem, argued the cause and filed a memorandum for respondent on review. With him on the memorandum were Dave Frohnmayer, Attorney General and James E. Mountain, Jr., Solicitor General, Salem. On the brief was Dave Frohnmayer, Attorney General, James E. Mountain, Jr., Solicitor General, and Jan Peter Londahl, Assistant Attorney General, Salem.

Cory Streisinger and Jack L. Landau, Portland, filed a brief of *amicus curiae* in behalf of the American Civil Liberties Union of Oregon, Inc.

CARSON, J.

Linde, J., concurred and filed an opinion.

**CARSON, J.**

At issue in this case is the constitutionality of the statute that prohibits harassment, defined as alarming another person by conveying a telephonic or written threat to inflict serious physical injury or commit a felony. ORS 166.065(1)(d) provides:

"A person commits the crime of harassment if, with intent to harass, annoy or alarm another person, the actor:

"* * * * *

"Subjects another to alarm by conveying a telephonic or written threat to inflict serious physical injury on that person or to commit a felony involving the person or property of that person or any member of that person's family, which threat reasonably would be expected to cause alarm;"

Defendant contends, *inter alia,* that the statute violates Article I, section 8, of the Oregon Constitution and that it is impermissibly vague. Article I, section 8, provides:

"No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for the abuse of the right."

Defendant was charged with making two telephonic threats to inflict serious physical injury, in that he threatened to kill one victim and her family and to bomb her home and car, and he threatened to kill another victim and to kidnap, rape and kill that victim's children.

Defendant filed a demurrer challenging the constitutionality of the statute on several state and federal constitutional grounds. The trial court held that the statute is not vague, but that it violates Article I, section 8, because it focuses on speech alone. The trial court's memorandum opinion stated:

"The present statute involves words alone which are communicated to the addressee over a distance, not face to face, and while such words may be threatening and may cause alarm they are not connected to any other element requiring conduct by the addressee nor is there any apparent present ability on the part of the speaker to carry out the threats. To uphold ORS 166.065(1)(d) would be to disregard the clear intent of the cases cited and others which have interpreted Article I, section 8 of the Oregon Constitution."

The state appealed and the Court of Appeals reversed, holding the statute is neither unconstitutional on its face nor as applied to defendant. That court was persuaded that ORS 166.065(1)(d) is a modern version of a historically established exception to the constitutional guarantee of free speech, and thus is not, on its face, a statute forbidden by Article I, section 8. The supposed historical exception was the English Waltham Black Act of 1723, which prohibited threats to commit certain felonies. The court next determined that the statute was not overbroad because, unlike the coercion statute overturned in *State v. Robertson,* 293 Or 402, 649 P2d 569 (1982), ORS 166.065(1)(d) is directed only at instances where the action threatened is wrongful, *i.e.,* threats to inflict serious physical injury or to commit a felony. The court held that threats to commit felonies are not protected speech. The court also concluded that the statute was not vague because its "proscriptions are clear and understandable and do not delegate 'basic policy matters' to police, judges or juries." *State v. Moyle,* 66 Or App 274, 280, 673 P2d 1366 (1983).

Defendant petitioned for review, contending that ORS 166.065(1)(d), on its face, is a violation of the free speech guarantees of Article I, section 8, of the Oregon Constitution and the federal First Amendment.[1] He also contends that it is vague in violation of Article I, sections 20[2] and 21,[3] and Article III, section 1,[4] of the Oregon Constitution and the federal

---

[1] The First Amendment to the United States Constitution provides:

"Congress shall make no law * * * abridging the freedom of speech, * * *"

The First Amendment prohibitions were not originally applicable to the states. They were made applicable to the states by incorporation through the Due Process Clause of the Fourteenth Amendment. *Gitlow v. New York,* 268 US 652, 45 S Ct 625, 69 L Ed 1138 (1924); *Palko v. Connecticut,* 302 US 319, 58 S Ct 149, 82 L Ed 288 (1937). Technically speaking, a state's violation of the prohibitions stated in the First Amendment is a violation of the Fourteenth, not the First Amendment. Here, however, we refer to the federal guarantees regarding free speech as First Amendment guarantees for clarity.

[2] Article I, section 20, provides:

"No law shall be passed granting to any citizen or class of citizens privileges, or immunities, which, upon the same terms, shall not equally belong to all citizens."

[3] Article I, section 21, provides:

"No *ex-post facto* law * * * shall ever be passed * * *."

[4] Article III, section 1, provides:

"The powers of the Government shall be divided into three seperate [sic]

Fourteenth Amendment.[5] We allowed review to further refine the analysis under Article I, section 8, of statutes alleged to impermissibly restrain speech. We affirm the Court of Appeals, but for different reasons.

## I. STATE CONSTITUTIONAL ANALYSIS

### A. Restraint on Speech by Terms of Statute.

In *State v. Robertson, supra,* we said that Article I, section 8, of the Oregon Constitution:

> "* * * forecloses the enactment of any law written in terms directed to the substance of any 'opinion' or any 'subject' of communication, unless the scope of the restraint is wholly confined within some historical exception that was well established when the first American guarantees of freedom of expression were adopted and that the guarantees then or in 1859 demonstrably were not intended to reach. Examples are perjury, solicitation or verbal assistance in crime, some forms of theft, forgery and fraud and their contemporary variants. Only if a law passes that test is it open to a narrowing construction to avoid 'overbreadth' or to scrutiny of its application to particular facts." 293 Or at 412. (Citation omitted.)

■ The first step in our analysis is to determine whether this statute, on its face, is a law whose very enactment was forbidden by Article I, section 8, *i.e.,* whether it is a law "restricting the right to speak * * * freely on any subject whatever." Even when a law by its terms restricts the right to speak, we have held that it does not, on its face, violate our state constitutional guarantee if the crime was one well established at the time our constitutional guarantee was enacted and demonstrably outside the aims of the guarantee of freedom of expression, or if the statute as written proscribes some effect, rather than communication itself. *State v.*

---

departments, the Legislature, the Executive, including the administrative, and the Judicial; and no person charged with official duties under one of these departments, shall exercise any of the functions of another, except as in this Constitution expressly provided."

[5] The Fourteenth Amendment to the United States Constitution provides:

Section 1. "* * * nor shall any State deprive any person life, liberty, or property, without due process of law; * * *"

*Robertson, supra,* 293 Or at 412, 416; *State v. Garcias,* 296 Or 688, 689, 679 P2d 1354 (1984).

### 1. Well-established Historical Exception.

■ The Court of Appeals held that this subsection of the harassment statute is sufficiently similar to the conduct proscribed by the English Waltham Black Act as to bring the contemporary statute within the historical exception analysis. We are persuaded, however, that the Court of Appeals' reliance on the Waltham Black Act as a historical exception to the free speech guarantee in Article I, section 8, is misplaced.

The Waltham Black Act, enacted by Parliament in 1723 and repealed in 1823, made it a capital offense to commit various enumerated crimes from murder to cutting down a sapling in the royal forests at Waltham, including sending unsigned or fictitiously signed letters threatening to commit a crime. The English Waltham Black Act does not appear to have been well-accepted or well-understood in England or in the American colonies. *See, e.g.,* Radzinowicz, A History of English Common Law, 78, 548-49, 580-81 (1948); 4 Blackstone, Commentaries on the Laws of England, 1427 (Lewis ed 1902). In *State v. Campbell,* T.U.P. Charl. 166, 167-68 (1808), the Georgia court said: "this law [the Black Act] is not only penal to a feudal degree, but it is productive of tyranny." The Waltham Black Act is more properly categorized as the type of politically repressive legislation we rejected in *Robertson* as a candidate for a historical exception.

By 1859, seven American states had statutes in effect prohibiting non-extortionate written threats to commit various felonies, but Oregon did not. In 1850, the Territory of Oregon had a law prohibiting the sending or delivery of threatening letters, whether extortionate or not. General Laws of Oregon, § 57, p 92 (1851). In 1853, however, this law was replaced by one prohibiting only extortionate written threats. Statutes of Oregon, § 34, p 189 (1854). Thus, when the Oregon Constitution was adopted in 1859, Oregon had no statute prohibiting non-extortionate written threats. We conclude that neither the English Waltham Black Act nor Oregon's short-lived territorial legislation outlawing non-extortionate written threats was a well-established "conventional crime" involving speech which was intended to be excluded from Article I, section 8, protection.

## 2. *Focus of the Law.*

■ The next question is whether the gravamen of the offense is the act of making the threat (speech), or whether it is producing the effect, alarm. We recently explained the critical distinction between laws directed against speech and those directed at preventing a forbidden effect:

> "[A]rticle I, section 8, prohibits lawmakers from enacting restrictions that focus on the content of speech or writing, either because that content itself is deemed socially undesirable or offensive, or because it is thought to have adverse consequences. * * * *[L]aws must focus on proscribing the pursuit or accomplishment of forbidden results rather than on the suppression of speech or writing either as an end in itself or as a means to some other legislative end."* State v. Robertson, supra, 293 Or at 416. (Emphasis supplied.)

In *Robertson,* we determined that the coercion statute then under review was directed against the pursuit of a forbidden effect, causing another person to engage in or refrain from conduct by threatening adverse consequences, and not against forbidding speech, and thus not a law whose enactment was prohibited, for that reason alone, by Article I, section 8. The coercion statute, *former* ORS 163.275, was held to be unconstitutionally overbroad, however, and not susceptible to a limiting judicial construction.

In *State v. Garcias, supra,* we determined that the menacing statute, ORS 163.190(1)[6] prohibits an effect — harm to the victim in the form of fear of imminent serious physical injury. The fact that the harm may be brought about by the use of words alone, unaccompanied by acts, does not alter the focus of the menacing statute, which is to forbid attempts to cause an identified harm, rather than forbidding the use of words, in themselves. We interpreted the menacing statute as an analogue to the common law crime of assault to sustain its validity.

Similarly, in *State v. Spencer,* 289 Or 225, 611 P2d 1147 (1980), we held the disorderly conduct statute (*former*

---

[6] ORS 163.190(1) provides:

"A person commits the crime of menacing if by word or conduct he intentionally attempts to place another person in fear of imminent serious physical injury."

ORS 166.025(1)(c))[7] to be unconstitutional because the statute made the use of certain kinds of words illegal, if spoken with a specific intent, regardless of whether the words had the intended effect upon the hearer. That statute was held to be directed towards speech itself, not toward the prevention of a specified harm.

So, too, in *State v. Blair*, 287 Or 519, 601 P2d 766 (1979), we held *former* ORS 166.065(1)(c),[8] the predecessor statute to the provision here under review, unconstitutionally vague. We noted that one of several problems with that provision was that the gravamen of the offense was that the offender communicated, rather than that he subjected the victim to a defined injury.

The elements of the crime of harassment by telephonic or written threat are as follows:

1. The accused intends to harass, annoy or alarm another person;

2. The accused conveys a written or telephonic threat either to inflict serious physical injury on that person or to commit a felony involving the person or property of that person or any member of his or her family;

3. The addressee is actually alarmed by the threat; and,

4. The threat is such that it reasonably would be expected to cause alarm.

By its terms, the statute does not punish one who conveys a telephonic or written threat unless the threat has

---

[7] *Former* ORS 166.025(1)(c) provided:

"A person commits the crime of disorderly conduct if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he:

"* * * * *

"Uses abusive or obscene language, or makes an obscene gesture, in a public place; * * *."

[8] *Former* ORS 166.065(1)(c) provided:

"A person commits the crime of harassment if, with intent to harass, annoy or alarm another person, he:

"* * * * *

"Communicates with a person, anonymously or otherwise, by telephone, mail or other form of written communication, in a manner likely to cause annoyance or alarm; * * *."

the effect of alarming the addressee, and such alarm must be reasonable in the circumstances. Harm to another, in the form of alarm, is the focus of the statute. Speech and writing are merely the means, albeit the only prohibited means, of achieving the forbidden effect — actual and reasonable alarm. Thus, the statute is one focusing on effect rather than speech itself. A further question, however, must be addressed: Is the effect one from which the legislature may properly shield individuals by a criminal law?

### 3. *May the effect be proscribed?*

■ ■ Some kinds of prohibitions may violate Article I, section 8, even if written in terms of "harms" rather than speech or writing. The constitutional prohibition against laws restraining speech or writing cannot be evaded simply by phrasing statutes so as to prohibit "causing another person to see" or "to hear" whatever the lawmakers wish to suppress. In principle, legislative power to select the objectives of legislation is plenary, except as it is limited by the state and federal constitutions. Except for these limitations, legislative power extends to protecting persons against harmful conduct by others, or whatever the legislature regards as harmful. It extends to protection against psychic or emotional as well as physical or financial harms. The menacing statute is an example of a law proscribing conduct in the form of speech alone that produces not physical harm but fear, an emotional harm, when the fear is engendered by threats of imminent physical injury. This statute was upheld in *State v. Garcias, supra.*

■ A difficulty arises, however, when a statute defines a crime in terms of causing a kind of harm which necessarily results only from speech or writing, so that the statutory definition is only the other side of the coin of a prohibition of the speech or writing itself.

We have held, for instance, that the emotional harm caused by damage to reputation in a civil action may not be remedied by punitive damages. *Wheeler v. Green,* 286 Or 99, 593 P2d 777 (1979). In *Hall v. The May Dept. Stores,* 292 Or 131, 637 P2d 126 (1981), we held that civil liability for abusive speech is limited to actual damages and excludes punitive damages, where an employee was unreasonably accused of

theft and threatened with arrest and criminal prosecution. The harassment statute similarly has as its object the use of the criminal law to punish "abuses" of speech that cause a private harm — alarm — in lieu of or in addition to a civil remedy for the injured person, to which *Wheeler* and *Hall* limited plaintiffs in those cases. We assume that a legislative body could not seek to remedy emotional harm in the form of disruption of a community sense of well-being brought about by communication that promotes discontent with a particular political party or the government in power, even if the statute were to require that actual emotional harm be suffered. When criminal penalties are at issue, the analysis requires us to examine the kind of emotional harm from which the law seeks to shield individuals.

Fear of physical violence to persons or property is not psychic or emotional harm resulting peculiarly from speech or writing. It is as likely to arise, and with greater intensity, from actual physical confrontations as from mere verbal threats. Protection of individual as well as societal interests in a sense of personal security among the citizenry is a classic objective of law, and Oregon law has been no exception. Since its earliest enactments, the Oregon Legislature has sought to preserve a sense of personal security among the citizenry. While harassment was nominally a new crime in Oregon when enacted in 1971, it was designed along with the disorderly conduct statute (*former* ORS 166.025) to replace laws classified as "disturbing the peace." Proposed Oregon Criminal Code § 220 (1970). The original harassment statute was intended specifically to reach " 'disorderly conduct' creating alarm or annoyance for an *individual*," while the disorderly conduct statute was intended to prohibit "disturbances of general or public impact." *Id.* at § 223.[9]

So, too, at common law, it was an offense to commit "any wilful deed * * * without lawful justification or excuse,

---

[9] The specific statutes which the original harassment statute replaced were *former* ORS 161.310 (offenses against public peace, health and morals), *former* ORS 166.030 (use of contemptuous language in a letter concerning one who refused to duel) and *former* ORS 165.550 (objectionable telephone calls). Proposed Oregon Criminal Code § 223 (1970). Two of these predecessor statutes, those proscribing offenses against the public peace and prohibiting the use of contemptuous language in a letter relating to a duel, survived with only minor changes from the Deady Code. *See* General Laws of Oregon, ch 50, § 659 and ch 43, § 526 (Deady 1845-1864).

which unreasonably disturbed the public peace and tranquility, or tended strongly to cause such a disturbance." Perkins, Criminal Law 400 (2d Ed 1969).[10] At common law a breach of the peace could occur either by a public disturbance or by disturbing a single individual. The use of abusive, insulting or opprobrious language in a public place was a breach of the peace, but such language had to be accompanied by "personal violence, either actually inflicted or immediately threatened" if the speaker was to be indicted for disturbing an individual. *Ware v. Branch Circuit Judge,* 75 Mich 488, 492, 42 NW 997 (1889); *State v. Steger,* 94 W Va 576, 119 SE 682 (1923); *see* Comment, *A Breach of the Peace By the Spoken Word,* 33 Conn Bar J 114, 115 (1959).[11]

Many of these breach of the peace statutes have been challenged in modern times for their vagueness, their broad reach and attendant discriminating enforcement. *See, e.g., Lewis v. City of New Orleans,* 415 US 130, 94 S Ct 970, 39 L Ed 2d 214 (1974); *Gooding v. Wilson,* 405 US 518, 92 S Ct 1103, 31 L Ed 2d 408 (1972); *State v. Spencer, supra.* We do not resurrect them here to indicate approval of a sweeping style of criminal code writing from an earlier era. Rather, these laws demonstrate the role the criminal laws have played historically in protecting individuals from certain emotional harms, namely the fear of physical harm to their person or property.

In short, ORS 166.065(1)(d) does not run afoul of Article I, section 8, for the reason that the effect that it proscribes, causing fear of injury to persons or property, merely mirrors a prohibition of words themselves. The statute, however, prohibits causing this effect specifically by words. Verbal threats are a central element in the definition of the crime. If the statute potentially reaches substantial areas of communication that would be constitutionally privileged and that cannot be excluded by a narrowing interpretation or

---

[10] The recognition at common law of the social value in providing citizens a sense of personal security was reflected in such offenses as "affray" and "riding or going armed with dangerous or unusual weapons" which were proscribed because of their "tendency to disturb the peace and tranquillity of the community" and "to terrify the king's subjects." Perkins, Criminal Law 401, 425 (2d ed 1969).

[11] There is a difference of opinion about whether a verbal threat without more, was indictable as a breach of the peace at common law. The better view seems to be that it was not. *See State v. Benedict,* 11 Vt 236, 34 Am Dec 688 (1839); Comment, *A Breach of the Peace by the Spoken Word,* 33 Conn Bar J 114, 115-16 (1959).

left to a case-by-case defense against the application of the statute, it would be unconstitutional. Therefore, it must be "scrutinized to determine whether it appears to reach privileged communication or whether it can be interpreted to avoid such 'overbreadth.' " *State v. Robertson, supra,* 293 Or at 418.

### B. Potential Reach of the Statute.

Defendant and *amicus* suggest that ORS 166.065(1)(d) covers myriad constitutionally privileged expressions in political, social and family settings. As examples of threats in a political context, defendant suggests: telephonic or written threats by the disenfranchised to break down the courthouse door to register to vote; political dissenters threatening "Death to the oppressors." Other hypothetical examples in political or industrial settings could be: demonstrators posting or carrying placards showing caricatures of political officials or corporation presidents hung in effigy; telephone threats made to non-striking workers, "If you cross that picket line, I'll break your neck."

■ Constitutionally protected free expression is not limited to political or industrial contexts. Article I, section 8, applies with equal force to protect free expression in personal and institutional relationships. Defendant suggests situations where one person telephones another to threaten: "If I ever catch you in bed with my wife again, I will break your face," or "If you don't turn that music down, I'll smash your stereo." By its terms, the statute also might punish one who overhears a threat made by another and conveys it as a warning to the person threatened. Moreover, threats to commit non-violent crimes such as embezzlement seemingly would be included. Some of the above-stated examples of written or telephonic threats would be constitutionally protected expressions. The next inquiry is whether ORS 166.065(1)(d) can be interpreted to prevent its application to protected speech.[12]

■ As noted earlier, the predecessor to the subsection

---

[12] The statute cannot be saved simply by adding or implying a limitation that it does not apply to those threats causing actual alarm that are constitutionally privileged. "Such an implied limitation not only trades overbreadth for vagueness; it abandons scrutiny of the statute altogether for case-by-case adjudication, contrary to the command that no law restricting this right 'shall be passed.' " *State v. Robertson,* 293 Or 402, 436-37, 649 P2d 569 (1982).

now under review, former ORS 166.065(1)(c), did not require that the offender subject the victim to some defined harm. The current subsection of the harassment statute, however, not only requires harm to the victim, but defines the harm to be prevented. The statute requires that the victim be alarmed. We think "alarm" in this statute means more than mere inconvenience or feelings of anguish which are the result of angry or imposing words; it means being placed in actual fear or terror resulting from a sudden sense of danger. Moreover, the first type of threat proscribed by the statute, "threat to inflict serious physical injury," indicates that the legislature sought to prevent the fear of physical harm to one's person.[13] This is consistent with the traditional breach of the peace requirement that fear of imminent personal violence be instilled in the victim.

■ We thus interpret the second type of threat proscribed by the statute, threats "to commit a felony involving the person or property of that person or any member of that person's family" to cover only threats to commit *violent* felonies against those persons or property. We interpret the legislature's wording "felony involving the person or property" to refer to felonies included in ORS Chapter 163 "Offenses Against Persons" and ORS Chapter 164 "Offenses Against Property." Violent felonies in these chapters include the homicide and assault offenses, some versions of rape and other sexual crimes, kidnapping, robbery and arson.

■ The statute, as written, requires neither proof of a specific intent to carry out the threat nor of any present ability to do so. However, the elements — actual alarm and the reasonableness of the alarm under the circumstances — have a similar purpose and effect. These elements limit the reach of the statute to threats which are so unambiguous, unequivocal and specific to the addressee that they convincingly express to the addressee the intention that they will be carried out.

---

[13] The legislative history of ORS 166.065(1)(d) indicates that an early version only proscribed subjecting another person to alarm by threats of serious physical injury. At the request of a Pacific Northwest Bell attorney who noted that the bill (SB 312) did not prohibit threats to kidnap or commit arson, the bill was amended to include threats of certain felonies. *See* Exhibit G, Senate Committee on Justice (Feb. 11, 1981 — letter from Pacific Northwest Bell legal counsel). There is no indication in the legislative history of SB 312 that the legislature specifically intended to include threats of non-violent felonies.

■ We also read this statute to punish only the person who expresses the intent to carry out the threatened conduct and only if that person conveys the threat to the intended victim of the threatened conduct, or to a family member. This interpretation of ORS 166.065(1)(d) will enable potential defendants, prosecutors, judges and jurors to distinguish between threats punishable under the statute and ambiguous, equivocal or non-addressee specific statements of intent to inflict some injury that either does not or, as a matter of law, should not reasonably induce a belief on the part of the addressee that the threat will be carried out.

■ This much appears from the statute itself or is implied from its common law breach of the peace origins. Something more must be implied, if the statute is to survive the scrutiny that led us to invalidate the coercion statute in *State v. Robertson, supra.* The threat of violence to person or property must be a genuine threat. That is to say, the danger that the message will be followed by action must be found from the evidence to be objectively probable from the perspective of the factfinder, not only subjectively from the perspective of the addressee.

A comparison of "harassment" as defined in ORS 166.065 (1)(d) with "coercion," as defined in the statute invalidated in *Robertson,* shows the following differences. The coercion statute proscribed the effect of compelling or inducing another person into otherwise undesired conduct by "instilling in him a fear" of a variety of specified consequences if the actor's demands were not met. It was the *effective demand* that was the gravamen of the crime, not the threat of the consequences as such. We held the statute overbroad because there were many kinds of situations, some of them described in the *Robertson* opinion, in which a demand that the addressee act or refrain from acting in a certain way would be privileged, even if accompanied by threats of actions that would not be privileged if actually carried out.

This class of possible applications could not be excluded from the coercion statute by implication, and it led us to invalidate the statute. Obviously, the same kinds of demands accompanied by threats could not, consistently with *Robertson,* simply be prosecuted under a statute forbidding the threats rather than the demands, such as ORS 166.065(1)(d).

That would be a verbal distinction without an operational difference. However, the distinction would not be an empty one if the harassment statute applies only to genuine threats that pose an objective risk of breaches of the peace, as that term has been discussed above, excluding the kind of hyperbole, rhetorical excesses, and impotent expressions of anger or frustration that in some contexts can be privileged even if they alarm the addressee. Even in the context of street confrontations, in which potential breaches of the peace are closer than in a telephone call or a written message, the United States Supreme Court, applying the First Amendment, demands a showing that words are likely to lead to acts before hot-headed and threatening words may be punished. *See* Tribe, American Constitutional Law 617-23 (1978) and cases cited therein at 618 n 5. Although the statutory text of ORS 166.065(1)(d) covers more, in the kind of relationships discussed in *Robertson,* the statute could constitutionally be applied only if the threat is objectively likely to be followed by unlawful acts. If prosecutions are so limited, the emphasis on the nature of the threats distinguishes this statute from the focus of the coercion statute on demands backed by threats that might be neither unlawful nor seriously meant.

A second distinction is that it is easier to find situations in which a person is constitutionally privileged to demand that another change his course of action, even under a threat of adverse consequences, as set out in *Robertson,* than situations in which a person is privileged to threaten another with unlawful violence unrelated to any demand and not contingent upon any choice of the addressee to accede to such a demand. There may be situations in which the statute, even as narrowed in this opinion, could not constitutionally be applied; but we believe, different from our conclusion about the coercion statute in *State v. Robertson, supra,* 293 Or at 436-37 and n 32, that these situations can be determined by prosecutors and by courts when they arise.

### C. *Vagueness.*

Defendant contends that ORS 166.065(1)(d) is vague because it does not fairly warn a person of ordinary intelligence of what conduct is prohibited. Specifically, defendant

argues that the following statutory terms are vague because they require a person to guess at their meanings: "alarm," "threat reasonably * * * expected to cause alarm," "serious physical injury," and "felony."

As discussed above, we interpret the term "alarm" to mean the dictionary definition: "fear or terror resulting from a sudden sense of danger."[14] "Fear or terror" are words of common understanding. Furthermore, the alarm can only be caused by specific categories of wrongful conduct, threats to inflict serious physical injury or to commit a violent felony involving the person or property of that person or any member of that person's family. While it is true that there may be wide variations in the kinds of threats which subjectively instill alarm in different individuals, the statutory phrase "threat reasonably * * * expected to cause alarm" has been construed herein to require not only that the addressee have a reasonable belief under the circumstances that the threat actually will be carried out, but also that the factfinder finds this to be objectively probable.

The terms "serious physical injury" and "felony" are used elsewhere and defined in the criminal code.[15] They require no more guesswork by a potential defendant under ORS 166.065(1)(d) than under those other sections of the criminal code.

We hold that the specific phrases and terms in ORS 166.065(1)(d) to which defendant objects are not impermissibly vague in violation of the Oregon Constitution, because they adequately inform potential defendants of the prohibited

---

[14] Webster's Third New International Dictionary 48 (unabridged 1971).

[15] "Serious physical injury" is defined in ORS 161.015(7) as follows:

" 'Serious physical injury' means physical injury which creates a substantial risk of death or which causes serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ."

"Felony" is described in ORS 161.525 as follows:

"Except as provided in ORS 161.585 and 161.705, a crime is a felony if it is so designated in any statute in this state or if a person convicted under a statute of this state may be sentenced to a maximum term of imprisonment of more than one year."

conduct, and they do not delegate uncontrolled discretion to a judge or jury to punish or withhold punishment.

## II. FEDERAL CONSTITUTIONAL ANALYSIS

### A. *First Amendment.*

■ Defendant also has challenged ORS 166.065(1)(d) on the ground that it is overbroad in violation of the federal First Amendment. We conclude that, as interpreted above to meet the demands of Oregon's constitutional guarantee of free expression, the statute also passes muster under the First Amendment.

■ As to the meaning of the federal Constitution and laws, to which "the judges in every state shall be bound," US Const, Art VI, cl 2, we are bound only by the interpretations given those laws by the Supreme Court of the United States. But ordinarily we also respect the decisions of lower federal courts on issues of federal law. The Supreme Court considered a statute prohibiting threats in *Watts v. United States,* 394 US 705, 89 S Ct 1399, 22 L Ed 2d 664 (1969), involving a conviction under 18 USC § 871(a), which punishes anyone who "knowingly and wilfully * * * [makes] any threat to take the life of or to inflict bodily harm upon the President of the United States." That statute was construed to be constitutional on its face by a judicial narrowing of the term "threat." The government is required to prove that a "true threat" has been made, as distinguished from political hyperbole which is constitutionally protected speech. The Supreme Court did not construe the statute to require proof of an intent to carry out the threat to attack the President, but it did overturn Watts' conviction because his supposed threat was made during a public rally where both he and the crowd responded with laughter.[16]

It is not immediately apparent what the Court meant by a "true threat" if the person making the threat neither intends nor expects anyone else to act upon it. Nevertheless,

---

[16] Watts said:

"* * * And now I have already received my draft classification as 1-A and I have got to report for my physical this Monday coming. I am not going. If they ever make me carry a rifle the first man I want to get in my sights is L.B.J." *Watts v. United States,* 394 US 705, 706, 89 S Ct 1399, 1401, 22 L Ed 2d 664 (1969).

lower federal courts have read *Watts* to establish that no such intent is required.[17] The Court of Appeals for the Second Circuit has cited *Watts* to sustain a prohibition against communicating threats to kidnap or injure any person, 18 USC § 875(c), if the threats are made "with the apparent determination to carry them into execution," and "so unequivocal, unconditional, immediate and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution." *United States v. Kelner,* 534 F2d 1020, 1025, 1027 (2nd Cir 1976). The references to "apparent" determination and "conveying" a gravity of purpose leave the same ambiguity as to whose perspective is meant with which we have dealt in our opinion,[18] but there is no doubt that our choice of the perspective of an objective factfinder would satisfy the *Kelner* court. Subsequently, that court also sustained a Connecticut statute prohibiting telephone harassment, *Gormley v. Dir, Conn State Dept of Prob,* 632 F2d 938 (2nd Cir), *cert den* 449 US 1023, 101 S Ct 591, 66 L Ed 2d 485 (1980), and the Third Circuit Court of Appeals sustained a similar federal statute, *United States v. Lampley,* 573 F2d 783 (3rd Cir 1978).

It is possible to disagree with the analysis of the opinions in these decisions. We believe, however, that the decisions themselves, resting on the Supreme Court's somewhat ambiguous reference to "true threats" in the rather special context of threatened assassinations of the President, nevertheless support our conclusion that ORS 166.065(1)(d), as limited in this opinion, would not be invalidated for overbreadth under the First Amendment.

---

[17] The cases decided since *Watts v. United States, supra,* under 18 USC § 871(a) have almost uniformly held that no proof of an actual intent to carry out the threat is required by the statute. *See, e.g., United States v. Hall,* 493 F2d 904, 905 (5th Cir 1974), *cert den* 422 US 1044, 95 S Ct 2661, 45 L Ed 2d 696 (1975); *United States v. Rogers,* 488 F2d 512, 514 (5th Cir 1974), *rev'd and remanded on other grounds,* 422 US 35, 95 S Ct 2091, 45 L Ed 2d 1 (1975).

[18] The quoted text cannot refer simply to the content of the threat. Threats intended to convey an "apparent determination to carry them into execution" are broadcast on television every day in settings which the viewer is supposed to recognize as fiction. Once something more than content is required to determine whether threatening words constitute a "true threat" or "convey a gravity of purpose and imminent prospect of execution," a factfinder in a prosecution equally may find that the verbal threat was a mere fiction, whether or not this was apparent to the addressee.

## B. Vagueness.

 For the same reasons discussed above under the state constitutional analysis of defendant's vagueness challenge, we hold that the statute is not impermissibly vague in violation of the Fourteenth Amendment to the United States Constitution.

The district court erred in sustaining defendant's demurrer. The decision of the Court of Appeals is affirmed.

**LINDE, J.,** concurring.

The trial court held the "harassment" statute unconstitutional because its prohibition involved only words "communicated to the addressee over a distance, not face to face, and * * * not connected to any other element requiring conduct by the addressee" nor any present ability of the speaker to carry out the threat. Taking the statute to mean what its words say, that conclusion was perfectly reasonable. The Court of Appeals, in turn, attempted to save the statute by invoking a supposed historical antecedent which, as this Court notes, exemplified the kind of repression that motivated adoption of the constitutional guarantees of free expression.[1]

Because the statute requires the accomplishment of a concrete result (alarm) beyond speech or writing itself, its critical problem, as in the case of the "coercion" statute invalidated in *State v. Robertson,* 293 Or 402, 649 P2d 569 (1982), is overbreadth. The Court has undertaken heroic measures to save the harassment statute from the same fate. What remains of it may leave little of what its legislative sponsors hoped to accomplish. The factfinder must be convinced beyond a reasonable doubt, on adequate evidence, that the threat of felonious violence was objectively "real," that is to say, intended and likely to be carried to the point of a breach of the peace. This will not be easy to show when the threat is made by telephone or writing rather than face-to-face, as the trial court said. It will not protect people from

---

[1]Under *State v. Robertson,* 293 Or 402, 412, 649 P2d 569 (1982), the state's burden is to show not only that a historical exception was "well established when the first American guarantees of freedom were adopted" but also that "the guarantees then or in 1859 demonstrably were not intended to reach" it.

being annoyed or alarmed by spiteful messages or by irresponsible pranks, as the legislation probably was meant to do.[2]

The Court recognizes that there still may remain situations to which the statute could not constitutionally be applied, because the threatened breach of the peace is too remote or perhaps because the words are otherwise privileged under the circumstances. But our present task is only to determine whether the statute must be altogether invalidated. The Court is content to leave the questions of its constitutional application to subsequent cases, and so am I.

---

[2]Nothing in the Court's opinion prevents the legislature from providing a nonpunitive civil remedy for the private harm caused by an "abuse" of speech or writing, Or Const Art I, § 10, *Hall v. May Department Stores Co.*, 292 Or 131, 146-47, 637 P2d 126 (1984), including a scheme under which public officers investigate and prosecute the victim's claim, as they now must do in order to prosecute a criminal charge under ORS 166.065(1)(d).